IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**JOHN A. JOHNSON**,

Plaintiff,

v.

**WINCO HOLDINGS, INC.,** a
foreign business corporation,

Defendant.

Civ. No. 6:21-cv-00831-AA

**OPINION & ORDER**

_____

AIKEN, District Judge:

Plaintiff is a former employee for defendant WinCo Holdings, Inc., a company operating retail grocery stores. Plaintiff claims that defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, when it terminated his employment. Before the Court is defendant's motion for summary judgment. For the reasons explained, defendant's motion, ECF No. 30, is GRANTED

## BACKGROUND

WinCo is an employee-owned company that operates retail grocery stores in Oregon and several other states. In April 2016, WinCo hired plaintiff as a produce clerk at its Store # 132 in Portland, Oregon. In February 2018, plaintiff transferred

to Store # 20 in Salem to work as a Manager in Training (MIT) in the Bulk Foods department.  At the time, Michael Miller was the Store Manager and Dan Rouhier and Matt Malloy were the Assistant Store Managers at Store # 20.  As the bulk foods MIT, plaintiff reported to Thomas Williams, the Department Manager.

Store # 20 maintains a no-fault Attendance Policy, under which employees are assessed attendance "points" for unexcused absences, tardies, and incomplete shifts that are not legally protected.  *See* Tripp. Decl., Ex. 6 at 3, ECF No. 31-6.  The Attendance Policy defines excessive absenteeism as accumulating greater than or equal to either: (1) nine points in a three-month period or (2) fifteen points in a twelve-month period.  *Id*.  Whenever an employee is issued attendance points, WinCo generates an Employee Attendance Form that lists the new points as well as cumulative point totals for the prior three months and prior twelve months.  The form is then delivered to the employee for the employee to sign.

Excessive absenteeism under WinCo's Attendance Policy results in progressive discipline under the collective bargaining agreement (CBA) that applied to plaintiff's employment.  Miller Decl. ¶ 3, ECF No. 32.  The progressive discipline practice during the relevant period at Store # 20 included verbal warning, written warning, suspension, and termination.  *Id*.  The CBA also provides a grievance procedure, under which employees can challenge employment actions.  *Id*. ¶ 4.

Plaintiff's duties as bulk foods MIT required him to be on his feet most of the day.  Around May 2019 he began experiencing severe foot pain.  He saw a doctor and was diagnosed with peripheral neuropathy.  Plaintiff's physician prescribed him

Gabapentin to treat the pain. The Gabapentin helped alleviate some of the pain and allowed him to work but it also had a sedating effect and reduced his mental clarity. Along with the foot pain, the neuropathy also made it harder for him to manipulate things with his hands such as loading products.

Plaintiff told Williams about his medical condition. Williams instructed plaintiff to sit down during his shifts as needed. Williams also spoke with Miller, the store's manager, about plaintiff's condition. Over time, plaintiff's condition worsened. Later in 2019, plaintiff's physician increased the Gabapentin from 300 MG twice daily to 600 MG three times daily. Because of plaintiff's reported complications with that increase, the physician switched plaintiff to Lyrica. *See* Johnson Decl. ¶ 4, ECF No. 38.

Plaintiff's medical challenges with side effects from his medication worsened and, on January 10, 2020, he submitted a letter of resignation to Williams. In the letter of resignation, plaintiff explained that his neuropathy was progressively getting worse. He stated that working on his feet for 8 hours was a painful struggle, the weakness and pain in his hands made him drop things, and his ability to concentrate was reduced both by the pain and by the medication that reduces the pain.

When Miller received plaintiff's letter, rather than accepting the resignation, he initiated an interactive process with plaintiff to discuss plaintiff's condition and possible accommodations. Miller Dep. 11:13-15:25, ECF No. 39-2. Miller advised plaintiff that WinCo would transfer him to a cashier position and provide him with a

stool so he could sit while cashiering.  Johnson Decl. ¶ 5, ECF No. 38.  Plaintiff agreed. On January 18, 2020, plaintiff submitted an amended letter confirming that he would step away from Bulk Foods MIT and become a cashier.  In that letter, plaintiff also explained that his ability to concentrate was reduced both by the pain and the medication that reduces the pain.  WinCo transferred plaintiff to the cashier position on January 26, 2020.  *Id.*

At the time plaintiff transferred from bulk foods MIT to cashier, there was no reasonable accommodation that would have enabled plaintiff to continue working as Bulk Foods MIT.  Johnson Dep. 56:2-15, 61:22-62:21; Miller Decl. ¶ 6. And aside from cashier, there were no other available positions at WinCo for which plaintiff was qualified and capable of working (with or without reasonable accommodation) with his medical restrictions.  Johnson Dep. 63:2-20.  Plaintiff's transfer to the Casher position and use of a stool resolved the work problems plaintiff was experiencing related to his foot pain.  The accommodation also addressed the issue with plaintiff's hands, which did not prevent him from working as a cashier or doing a good job in that role.  And after the transfer to the cashier position, plaintiff did not raise any issue about his hands to WinCo again.  WinCo was under the impression that the job transfer fully and effectively accommodated plaintiff.  Miller Decl. ¶ 5.

As a cashier, plaintiff reported to Miller, Rouhier, and Malloy.  Miller Decl. ¶ 8.  He was also subject to WinCo's Cash Handling Policy, which among other things, requires cashiers to ensure cash register balances are within expected amounts and without excessive cash discrepancies.  Tripp Decl., Ex. 11.  The policy defines

excessive cash discrepancy as any cash register shortage or overage of $30 or more per week and states that excessive cash discrepancy will result in progressive discipline. *Id*. WinCo's cashiers work two checkout lanes from the same cash register and check stand. Tripp Decl., Ex. 12 at 1.

Sometimes, a cashier will process two transactions at the same time, switching lanes in the middle of a transaction with a customer in one lane to assist a customer with a transaction in the other lane. Johnson Dep. 83:16-84:2. When a cashier does that, the cashier then needs to switch back to the first lane to complete that transaction. *Id*. at 83:16-84:2. That process is called lane changing. *Id*. WinCo's cashiers at Store # 20 are not required to change lanes and can instead choose to work only one lane at a time. Miller Decl. ¶ 9; Tripp Decl. Ex. 1, at 90:21-92:8.

On January 29, 2020, plaintiff had a cash register shortage of $154.13 and was given a non-disciplinary policy consultation as a result. Tripp Decl. ¶ 15. On February 2, 2020, plaintiff had a cash register shortage of $31.74 and was issued a verbal warning as a result. Tripp Decl. ¶ 16, Ex. 1 at 92:17-93:12, Ex. 14. On February 24, 2020, plaintiff had a cash register shortage of $46.82 and was issued a written warning as a result. Tripp Decl. ¶ 17, Ex. 1 at 94:21-95:21, 96:11-97:11, Ex. 15. All of plaintiff's cash register shortages related to instances of lane changing when plaintiff failed to charge a customer for merchandise. Tripp Decl. Ex. 1, at 84:3-4. Rouhier explained to plaintiff during the January 29 policy consultation that he was not required to change lanes and could instead choose to work only one lane at a time. Tripp Decl. Ex. 1, at 90:21-92:8. On February 26, 2020, two days after plaintiff's

final cash register shortage that resulted in the written warning, plaintiff contacted Miller and explained that his neuropathy medication was causing him confusion and making it difficult for him to comply with WinCo's Cash Handling Policy. Tripp Decl. ¶ 18, Ex. 1 at 81:7-83:15, Ex. 16, Ex. 3 at 27:2-11.

Although plaintiff reported experiencing confusion in earlier discussions before he started working as a cashier, he did not bring to Miller's attention that this confusion was interfering with his cashier work. Tripp Decl. Ex. 1 at 86:10-22. According to plaintiff, during the conversation, Miller "listened," was "thoughtful," and "seemed like he was trying to arrange things . . . to solve the problem." Tripp Decl. Ex. 1 at 82:17-83:4.

Immediately after his conversation with plaintiff, Miller contacted Liz Hoover, WinCo's HR/Compliance–Protected Leave Laws representative, and Melody Wingert, WinCo's Regional HR Specialist–Oregon at the time, for assistance finding a reasonable accommodation for plaintiff's problems in complying with the Cash Handling Policy. Tripp Decl. ¶ 19, Ex. 3 at 27:2-11, 32:5-22, Ex. 16, Ex. 17. Miller, Hoover, and Wingert reviewed plaintiff's job description and reported limitations and considered various potential accommodations. Tripp Decl. Ex. 3 at 32:5-22, Ex. 17. Ultimately, they decided to offer plaintiff the option of packaging items in the deli such that he would not have to handle cash. Tripp Decl. Ex. 3 at 32:5-33:8.

On March 27, 2020, Miller met with plaintiff to see how he was doing and whether he was interested in an accommodation that would allow him to package items in the deli. Johnson Dep. 99:2-100:15. Plaintiff told Miller that he had changed

the time he was taking his medication and, as a result, was "clear minded at work" and felt he was doing "much better." Tripp Decl. Ex. 1 at 99:2-100:15. Plaintiff explained that he felt supported by his co-workers, was happy, and wanted to continue working as a cashier. Johnson Dep. at 99:2-100:15. The change to plaintiff's medication schedule, which was made on February 4, 2020, reduced the side effects enough that he could perform his job and comply with WinCo's policies. Johnson Dep. 85:2-25, 99:2-21, 140:1-7, 174:18-176:4.

Rouhier had a follow-up meeting with plaintiff on April 3, 2020. Tripp Decl. ¶ 20, Ex. 1 at 105:5-107:3, Ex. 18, Ex. 2 at 53:1-55:23; Crow Decl. ¶ 8. Rouhier and plaintiff again discussed a possible accommodation in the form of plaintiff doing other work tasks besides working as a cashier. Johnson Dep. 105:5-107:3; Tripp Decl, Ex. 18, Ex. 2 at 53:1-55:23. Plaintiff explained that the accommodation was "not needed." Johnson Dp. 105:22-106:4; Tripp Decl., Ex. 18 at 1. And he confirmed in writing to WinCo that he was not having trouble performing any job functions and that he "wish[ed] to decline any reasonable accommodation." *See* Plf.'s Resp at 11; Johnson Dep. 106:20-107:13; Tripp Decl., Ex. 18 at 2.[1]

In May 2020, plaintiff's attendance points updated from a recent tardy, which caused his points to reach the level of excessive absenteeism in violation of WinCo's Attendance Policy. Tripp Decl., Ex. 20, Ex. 4 at 25:13-26:13. Malloy issued a

---

[1] On May 21, 2020, there was another shortage of more than $30 on plaintiff's cash register, but this was later found to be a mistake, where plaintiff had left his log-in active on the cash register and another employee had made the error. That employee was disciplined.

suspension for the Attendance Policy violation.  Johnson Dep. 108:4-111:15; Tripp Decl., Ex. 20.

On December 2, 2020, plaintiff asked Rouhier to change plaintiff's work schedule such that he would not be scheduled for back-to-back shifts where one shift ended at night and the next one began early in the next morning.  Tripp Decl. ¶¶ 23, 24, Ex. 1 at 19:20-22:13, 27:5-17, 30:4-13, Ex. 21 at ¶ 10, Ex. 22.

Plaintiff requested no other scheduling modification at WinCo.  Tripp Decl. Ex. 1 at 23:16-25:3. Plaintiff stated to Rouhier that he was requesting the scheduling change because the side effects of his medication were making it difficult for him to attend work on time.  Johnson Dep. 183:21-184:4, 187:7-15.

In response, Rouhier explained that there was an easy solution and gave plaintiff an availability form to fill out.  *Id.* at 22:14-23:9.  Later that same day, plaintiff filled out the availability form, indicating that he did not want to be scheduled for shifts beginning earlier than 11:00 a.m. Monday through Friday or earlier than 9:00 a.m. Saturday and Sunday, and returned it to Rouhier. Tripp Decl., Ex. 22.

Rouhier immediately updated plaintiff's availability in WinCo's scheduling system, granting plaintiff's requested change.  Tripp Decl. Ex. 21 ¶ 10.  Plaintiff believed he could work shifts within the restricted hours stated on the availability form he gave Rouhier without his medical condition causing him to be tardy. Johnson Dep. 29:22-30:3, Tripp Decl., Ex. 22.  In briefing, plaintiff asserts that Rouhier

"became stand-offish" after plaintiff made the scheduling request.  See Plf.'s Resp at 17-18.

After the schedule accommodation, plaintiff continued to be tardy for shifts. Tripp Decl. ¶ 25, Ex. 1 at 111:18- 112:25, 115:13-25, Ex. 23 at 35-38.3.   In total, plaintiff was tardy in violation of WinCo's Attendance Policy 17 times during his employment at Store # 20.  Johnson Dep. 111:18-112:25, 115:13-25; Tripp Decl., Ex. 23.  Each time, WinCo provided plaintiff with an Employee Attendance Form that listed his total attendance points.  Johnson Dep. 111:18-112:25, 115:13-25; Tripp Decl., Ex. 2 at 30:4-31:18, Ex. 7, Ex. 20 at 34:1-23, Ex. 23.  Plaintiff asserts that the tardiness was due to fogginess from his medication which caused him to oversleep and not be aware of time.  Plf.'s Resp. at 11-12.  Plaintiff also asserts, without support, that he could not determine how many negative attendance points he had accrued because there was not an opportunity to discuss it with Rouhier.  *Id.* at 13.

On December 27, 2020, Miller became Store Manager at a different WinCo store, and Nolan Crow took over as Store Manager of Store # 20.  Plaintiff's final tardy occurred on December 31, 2020.  Johnson Dep. 111:18-112:25, 115:13-25; Tripp Decl., Ex. 23 at 37-38.  That tardy was due to traffic congestion and had nothing to do with plaintiff's described medical condition.  Johnson Dep. 116:1-19, 118:15-20.[2]

The December 31 tardy brought plaintiff's attendance points to a level that constituted excessive absenteeism in violation of WinCo's Attendance Policy.  Tripp

---

[2] Around this time, plaintiff left work without permission once due to what he asserts was a complication of his neuropathy.  The next day, he discussed this with Rouhier, who did not assess him any negative points for the absence.

Decl. ¶ 26, Ex. 6, Ex. 24.  Because plaintiff had been issued a verbal warning, written warning, and suspension within the past 12 months, the next level of discipline under WinCo's progressive discipline policy and practice was termination.  Tripp Decl. Ex. 2 at 48:1-14.  As a result, WinCo terminated plaintiff's employment on January 7, 2021.  Tripp Decl., Ex. 24.

Rouhier and Crow discussed plaintiff's attendance and disciplinary history and next steps regarding his employment.  As Store Manager, Crow ultimately made the termination decision.  Tripp Decl. Ex. 5 at 8:21-9:23.

Plaintiff grieved his termination to WinCo's Employee Association dispute hearing sub-committee.  Tripp Decl. ¶ 27; Johnson Dep.128:15-129:14.  After a hearing, the Employee Association dispute hearing sub-committee upheld the termination.  Johnson Dep. 128:15-129:14; Tripp Decl., ,Ex. 25 at 2.  Plaintiff appealed that decision to WinCo's Department Managers Employee Association dispute hearing sub-committee.  On that final day of the hearing, plaintiff states that be obtained a note from his doctor stating that his medication could cause the symptoms that resulted in his tardiness.  The sub-committee upheld the termination.  Johnson Dep. 128:15-129:14; Tripp Decl., Ex. 25 at 3-4.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

court must construe the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

Plaintiff filed an Amended Complaint on September 6, 2021, ECF No. 14, alleging discrimination based on disability under the ADA and State Disability Law, 42 U.S.C. § 12112 and ORS 659A.112; failure to accommodate a disability in violation of 42 U.S.C. § 12181 and ORS 659A.112; and retaliation for engaging in protected activities under the ADA.[3]

## I. Disability Discrimination Claims under the ADA and Oregon State Law

Plaintiff's first and second claims for relief allege disability discrimination under the ADA and ORS. § 659A.112, respectively. Disability discrimination claims under ORS. § 659A.112 are functionally equivalent to ADA claims, and both claims

---

[3] The parties stipulated to the dismissal of plaintiff's Seventh and Eighth Claims for Relief relating to age discrimination. Plaintiff also withdrew his Sixth Claim for Relief for retaliation under state law.

may be assessed together. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001).

To establish a prima facie case of disability discrimination under the ADA and Oregon law, a plaintiff must establish that he has a disability, was a qualified individual, and suffered an adverse employment action because of the disability. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged adverse employment action. *Id.* at 1090-94. Once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to establish that the defendant's explanation was pretext for discrimination. *Id.*

## I.    **Disparate Treatment**

In the context of a disparate treatment claim, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." Chuang v. Univ. of California Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000). The "change in working conditions must be more disruptive than a mere inconvenience." *Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) (citation omitted).

In response to defendant's motion, plaintiff asserts as the basis for discrimination an apparent claim based on disparate treatment: that Rouhier spent more time "chit chat[ing]" with other employees than he did plaintiff and that

Rouhier's "stand-offish" treatment became more noticeable after plaintiff requested the scheduling change. Plf.'s Resp. at 14, 17. Other allegations include that Rouhier told one employee that plaintiff did not like working in the mornings. Johnson Dep. 135:18-136:9. Plaintiff admits that Rouhier "wasn't rude to [him]." Tripp Decl. Ex. 1, at 140:21-141:1.

Here, the Court finds that, on this record, Rouhier's alleged reluctance to chitchat or gossip with plaintiff did not cause any materially adverse change in the terms or conditions of plaintiff's employment. Accordingly, it was not an adverse employment action. *See, e.g.*, *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) (holding that managers snide remarks and threats to the plaintiff could not constitute an adverse employment action); *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("badmouthing an employee outside the job reference context do[es] not constitute adverse employment action[]." (citations omitted));

Undisputed evidence also establishes that when plaintiff asked Rouhier for assistance with work needs, Rouhier quickly responded and assisted plaintiff. For example, plaintiff testified that in or around the spring of 2020, plaintiff had a neuropathy related incident while at work and left work early without asking for permission or explaining why he needed to leave. Plf.'s Resp. at 12; Johnson Dep. 195:23-203:24, 275:22-276:13. According to plaintiff, the next day, Rouhier presented him with an attendance slip which also tallied plaintiff's standing attendance points for the incomplete shift. Johnson Dep. 195:23-202:9. Plaintiff told Rouhier that the incident had resulted from his neuropathy, that he was embarrassed, and that he did

not want to be in trouble for the incident. *Id*. Plaintiff testified that Rouhier was "quite friendly about the situation, seemed to understand, and decided to just not pursue it." *Id*. at 200:10-19. Plaintiff was not assessed attendance points for the incident. *Id*. at 195:23-202:9. Similarly, when plaintiff later requested the scheduling change from Rouhier in December 2020, Rouhier granted the request on the spot. *Id*. 19:20-23:9, 26:3-28:17, 30:4-13. Plaintiff presents no facts supporting his assertion that Rouhier's alleged conduct in talking to other employees more than plaintiff constituted adverse employment action, plaintiff's disability discrimination claims based on that alleged conduct must fail.

## II.    Wrongful Termination

Plaintiff also asserts as a basis for disability discrimination WinCo's termination of his employment. To establish a prima facie case of disability discrimination, a plaintiff must establish a causal link between his disability and the challenged adverse employment action. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1089 (9th Cir. 2001).

To establish his claim, plaintiff asserts that his tardiness to work was caused by his medical condition, and that WinCo fired him based on his medically related tardiness. Plaintiff maintains that WinCo was required to excuse his *past* tardies after he claimed they had resulted from his medication. Johnson Dep. 75:6-12, 138:16 140:7, 142:4-18, 184:22-185:9; Plf.'s Resp. at 12, 16, 18-19.

The evidence is that, after plaintiff had been assessed five tardies, plaintiff asked Rouhier for a new schedule that plaintiff believed would set him up for success

with his medication regimen, and prevent his condition from causing tardiness. Johnson Dep. 29:22-30:3; Tripp Decl., Ex. 22.    As described above, Rouhier immediately granted plaintiff's request, which restricted plaintiff's start time to after 11:00 a.m. on Monday through Friday and after 9:00 a.m. on Saturday and Sunday. The record shows that the negative attendance points underlying plaintiff's suspension and termination were for tardies for shifts that were scheduled within plaintiff's accommodated availability.    Johnson Dep. 111:18-112:25, 115:13-25; Tripp Decl., Ex. 23 at 22-38.    And, plaintiff's final attendance violation was occurred because of traffic congestion.    Johnson Dep. 116:1-19, 118:15-20.

Generally, conduct resulting from a disability is considered part of the disability and not a separate basis for termination.    But it is also true that "reasonable accommodation is always prospective," and therefore "an employer is not required to excuse past misconduct even if it is the result of the individual's disability."    EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *25, *cited with approval by Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 922 (9th Cir. 2017).

Consequently, plaintiff cannot establish the necessary causal link for his disability discrimination claims, where the evidence is that WinCo terminated plaintiff's employment based on tardiness not caused by plaintiff's medical condition. WinCo is entitled to summary judgment on those claims as a result.

## III.    Failure to Accommodate

Plaintiff asserts failure to accommodate claims under the ADA and ORS 659A.112. FAC at 6-8. In support of those claims, plaintiff contends WinCo failed to accommodate his disability because it did not (1) modify his schedule before December 2, 20206 or (2) retract his attendance points for past violations once he claimed that the past violations had resulted from his medication. FAC ¶¶ 40, 46; Johnson Dep. 75:6-12, 138:16-140:7, 141:14-142:21, 184:22-185:9.

The facts are not disputed that plaintiff did not request a scheduling change or bring to WinCo's attention any similar accommodation before December 2, 2020, and that Rouhier immediately granted plaintiff's request on that date. The evidence is that the information known to WinCo confirmed that plaintiff did not need any sort of accommodation related to the side effects of his medication. As set forth as background above, on February 26, 2020, plaintiff informed Miller that he thought his medication was causing confusion that made it difficult for him to comply with WinCo's Cash Handling Policy. Plaintiff did not raise any attendance issues at that time or at any other time before December 2, 2020.

Further, when Miller and Rouhier followed up with plaintiff to discuss a potential accommodation related to the Cash Handling Policy, plaintiff explained that he had changed the time he was taking his medication and, as a result, was "clear minded at work" and felt he was doing "much better." Johnson Dep. 99:2-100:15. According to plaintiff, the change to his medication schedule reduced the side effects enough that he was able to perform his job and comply with WinCo's policies.

Therefore, on April 3, 2020, plaintiff submitted a form to WinCo stating that he was not having trouble performing any job functions and that he "wish[ed] to decline any reasonable accommodation." Johnson Dep. 105:22-107:13; Tripp Decl., Ex. 18. When plaintiff stated his declination of further accommodation, he ended the interactive process. *See* EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at 26 ("As a general rule, the individual with a disability -- who has the most knowledge about the need for reasonable accommodation -- must inform the employer that an accommodation is needed.").

Accordingly, the evidence produced by the parties shows that WinCo had no reason to suspect that plaintiff was still experiencing side effects from his medication that were causing him problems at work, let alone that those side effects were causing him to be tardy—an issue that plaintiff did not raise with WinCo before December 2, 2020. Johnson Dep. 23:16-25:3. Although plaintiff continued to have tardies following April 3, WinCo did not have any information indicating that the tardies related to a medical condition.

Plaintiff's evidence is that he was tardy 17 times during this employment at Store # 20. Johnson Dep. 111:18-112:25, 115:13-25; Tripp Decl., Ex. 23. And it is undisputed that 6 of those tardies preceded the onset of plaintiff's medical condition. *See* Johnson Dep. 45:7-47:15, 173:1-13, 177:21-178:14 (plaintiff testifying that his condition was diagnosed in June 2019 and started causing him problems at work around that same time); *id.* at 111:18-112:25, 115:13-25; Tripp Decl., Ex. 23 at 5-14

(documentation of plaintiff's tardies at Store # 20 before June 2019). Thus, without any information from plaintiff, WinCo could not have been reasonably expected to know that plaintiff's tardies might have been related to a medical condition.

If the need for an accommodation arose again after plaintiff denied all accommodations and ended the interactive process on April 3, 2020, it was plaintiff's responsibility to inform WinCo of the change. As the EEOC has explained:

> An employee who is on notice about a performance or conduct problem and who believes the disability is contributing to the problem should evaluate whether a reasonable accommodation would be helpful. An employee should not assume that an employer knows about a disability based on certain behaviors or symptoms. Nor should an employee expect an employer to raise the issue of the possible need for reasonable accommodation, even when a disability is known or obvious.
> . . .
> It is best if an employee requests accommodation once he is aware that he will be violating an attendance policy or requiring intermittent leave due to a disability. Otherwise, an employer is entitled to continue holding the employee accountable for such absences without any obligation to consider if there is a reasonable accommodation that might address the problem.

EEOC, The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities, 2008 WL 4786697, at *14, 21. *See also* 29 C.F.R. § Pt. 1630, App. ("Employers are obligated to make reasonable accommodation only to the physical or mental limitations resulting from the disability of an individual with a disability that is known to the employer. Thus, an employer would not be expected to accommodate disabilities of which it is unaware."); EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *26 ("As a general rule, the

individual with a disability — who has the most knowledge about the need for reasonable accommodation — must inform the employer that an accommodation is needed.").

Here, there is no dispute that plaintiff did not request a scheduling accommodation before December 2, 2020. Thus, the Court finds that WinCo was not required to provide an accommodation before that date. *See* 29 C.F.R. § Pt. 1630, App; *see also Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) ("Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown in the interactive process." (citation omitted) (internal quotation marks omitted).

## IV.    Retaliation

Plaintiff asserts retaliation claims under the ADA alleging that WinCo treated him less favorably and ultimately terminated his employment because of his December 2, 2020 request to Rouhier for a scheduling change. FAC ¶¶ 40, 46, ECF Johnson Dep. 30:4-14, 142:22-144:3.

To establish a prima facie case of retaliation under the ADA and Oregon law, a plaintiff must show: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269 (9th Cir. 2009) (internal quotation marks and citation omitted.) In the context of retaliation claims, adverse employment actions are limited to "non-trivial employment actions that would deter reasonable employees from . . . engaging in protected activity." *Brooks*, 229 F.3d at 928 (citation omitted).

The burden-shifting framework discussed above applies equally to plaintiff's retaliation claims. *See, e.g.*, *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). Here, plaintiff relies on the same argument and evidence he did in support to support his discrimination claims, which the Court concluded could not survive defendant's motion for summary judgment. Therefore, just as plaintiff's discrimination claims fail because he cannot establish adverse employment action based on any conduct other than the termination of his employment, his retaliation claims fail for the same reason. Nor has plaintiff provided sufficient evidence of a causal connection between his request for a scheduling change and the termination of his employment, and plaintiff has failed to produce any evidence of pretext.

## CONCLUSION

Plaintiff's employment was terminated only after he received progressive discipline for many policy violations. The record demonstrates that WinCo fully and effectively accommodated plaintiff throughout his employment to the extent that it was on notice that plaintiff required accommodation and terminated plaintiff's employment only after issuing progressive discipline for several policy violations. This record establishes no evidence of a causal connection between the termination and plaintiff's disability or request for accommodation. It is undisputed that WinCo did not know that plaintiff required a scheduling accommodation before he requested a change to his schedule shortly before his employment ended, and WinCo granted that request immediately. The other alleged conduct challenged by plaintiff does not

constitute adverse employment action.  For these reasons, defendant's Motion for Summary Judgment, ECF No. 30, is GRANTED.

IT IS SO ORDERED.

Dated this 29th day of September 2023.

/s/Ann Aiken

Ann Aiken
United States District Judge